**In the Matter of the OFFICE OF DISTRICT PUBLIC DEFENDER FOR the FIRST JUDICIAL DISTRICT, State of Minnesota.**

No. C3–85–1212.

Supreme Court of Minnesota.

Aug. 30, 1985.

Mark B. Levinger, Sp. Asst. Atty. Gen., St. Paul, C. Paul Jones, Public Defender,

Minneapolis, Christopher Cuneo, Minneapolis, for appellant.

David C. Forsberg, Terry L. Slye, Kevin A. Berg, St. Paul, for respondent.

PER CURIAM.

The State Board of Public Defense petitioned this court for a writ of prohibition to prevent the judges of the First Judicial District from giving effect to their order of June 26, 1985. That order vacated the January 11, 1967, order of the judges of the First Judicial District which established the district's participation in the public defender system. The judges of the First Judicial District cross-petitioned for a writ of prohibition to prevent the State Board of Public Defense from giving effect to its appointment of Rick Mattox as district public defender for the First Judicial District. The judges of the First Judicial District also requested from this court a writ of mandamus compelling the State Board of Public Defense to appoint H. Richard Hopper the district public defender for the First Judicial District. Both parties petitioned for and were granted accelerated review by this court. We grant the petition of the State Board of Public Defense for a writ of prohibition and we deny the petitions of the judges of the First Judicial District for a writ of prohibition and a writ of mandamus. Such action has the effect of nullifying the order of the judges of the First Judicial District appointing H. Richard Hopper as district public defender and of confirming the appointment by the State Board of Public Defense of Rick Mattox as district public defender of the First Judicial District. We therefore issue a writ of prohibition directing the vacation of the order of the judges of the First Judicial District dated June 26, 1985.

On January 11, 1967, the judges of the First Judicial District issued an order establishing the office of district public defender in their district and appointing Richard Genty as district public defender. Mr. Genty served continuously as district public defender from 1967 to 1985. In February of 1985, Genty wrote a letter to the judges of the First Judicial District, informing them of his possible resignation as district public defender and recommending that Richard Hopper, an assistant public defender in the First Judicial District, be appointed his successor. On May 1, 1985, Genty informed State Public Defender C. Paul Jones by telephone that he was going to resign as district public defender. On May 2, Genty advised Judge Kevin Burke, the chair of the State Board of Public Defense, of his intent to resign as district public defender, effective June 30, 1985. In his letter of resignation, Genty recommended that the board appoint Mr. Hopper the new district public defender, effective July 1, 1985.

On May 1, 1985, Chief Judge Robert Breunig, Richard Genty, and Richard Hopper met in the judge's chambers to discuss amending the 1985 budget of the district's public defender office to reflect Genty's resignation. They also discussed the possible need to appoint an interim district public defender, should the State Board of Public Defense fail to appoint Genty's replacement before Genty's resignation on June 30, 1985. On May 10, 1985, Genty wrote a letter to Chief Judge Breunig which included a proposed " 'order amending, but not increasing, budget for calendar year 1985,' which would conform to the discussions between you, Assistant Public Defender H. Richard Hopper and myself when we met in your chambers. * * * " The proposed order amended the budget of the district public defender's office to reflect Genty's resignation and appointed Hopper interim district public defender "pending official appointment of a successor" to Genty. Judge Burke, upon receiving a copy of the proposed order, called Chief Judge Breunig, told him that the board would appoint a replacement for

Genty by July 1, and urged Chief Judge Breunig not to sign the proposed order. Chief Judge Breunig agreed not to do so.

On May 8, 1985, Chief Judge Breunig wrote to State Public Defender C. Paul Jones and informed him that the judges of the First Judicial District recommended that Richard Hopper be appointed the district public defender. Jones had begun advertising the district public defender vacancy immediately upon receiving Genty's resignation letter on May 2. Jones sent a letter to the court administrator of the First Judicial District asking that an announcement of the vacancy be posted in each courthouse in the district and that all of the judges of the district be made aware of the vacancy "so that they can spread the word if they so choose." On May 20, Judge Burke wrote to the county commissioners of the counties comprising the First Judicial District and to the president of the First District Bar Association, informing them of Genty's resignation, enclosing a copy of the notice of vacancy, and stating that if they were "aware of any attorneys who you could recommend or who might be interested in the position, the Board of Public Defense would appreciate your input." On May 23, Judge Burke wrote to Chief Judge Breunig, informing him that:

> The State Board of Public Defense met on May 15th and told Mr. Genty that we will schedule a meeting of the State Board and appoint his successor shortly after the June 10th posting for the vacancy. I have received indications that there will be other candidates for the position in addition to Mr. Hopper. I recognize that the judges of the district have recommended Mr. Hopper as Mr. Genty's successor; however, in light of the fact that at the time there were no other applicants, I will defer to your judgment as to whether or not the judges of your district wish to make any further recommendations. I am more than willing to schedule a joint meeting of the State Board of Public Defense with some or all of your judges and have that meeting in your county if you desire.

The board received six applications for the district public defender opening by its June 10, 1985, deadline. An ad hoc selection committee of the board selected three applicants, Richard Hopper, Rick Mattox, and David Skeen, for the board to interview at its June 19 meeting. The other three applicants were informed that they could address the board at the June 19 meeting if they desired to do so. All applicants were informed that the board would vote to appoint at this meeting. A letter was sent to each judge of the First Judicial District indicating who would be interviewed, inviting comments from the judges, and inviting them to attend the board's meeting on June 19, 1985.

After interviewing the applicants at its June 19 meeting, the State Board of Public Defense voted to appoint Rick Mattox the district public defender for the First Judicial District. The judges of the First Judicial District learned that the board had appointed Rick Mattox as district public defender on June 20. On June 26, 1985, 18 of the 20 judges of the First Judicial District met, reviewed the public defender statute, concluded that they had the right to withdraw from the public defender system, and unanimously voted to do so. Chief Judge Breunig issued an order to that effect the same day. Chief Judge Breunig then met with Genty and Hopper to discuss how to provide public defender services to the district. On June 27, 1985, Chief Judge Breunig issued a second order naming Richard Hopper acting public defender for the district, retaining the assistant public defenders, and establishing a 6-month budget for the provision of public defense services in the district.

1. Minn.Stat. § 611.26, subd. 1 (1984), provides that:

> A majority of the judges of any judicial district * * * may, by written order filed with the state board of public defense, establish in the district the public defender system provided in Laws 1965, Chapter 869. * * *

While the statute establishes a procedure for judicial districts to join the public defender system, it is silent on the issue of withdrawal from the system. The judges of the First Judicial District assert that because their decision to establish a public defender in the district was voluntary, they can revoke their participation in the system at any time. The judges point out that the legislature has never made participation in the system mandatory. The State Board of Public Defense contends, however, that because the statute contains no method for terminating participation in the system once it is established in a judicial district, the legislature intended that a district that chooses to participate in the system must remain in the system.

■ We conclude that once the judges of a judicial district file an order with the State Board of Public Defense establishing the public defender system in their district, they may not withdraw their district from the public defender system. Prior to the 1965 enactment of the bill providing for a statewide system of public defense, courts appointed counsel to represent indigent criminal defendants on a case-by-case basis. The appointment and compensation of counsel for indigent criminal defendants was governed by Minn.Stat. § 611.07 (1984), first enacted by the legislature in 1869. The 1965 public defender bill repealed Minn.Stat. § 611.07 as to any judicial district that decided to establish a public defender system. *See* Minn.Stat. § 611.-28 (1984). This indicates that the legislature intended a district's participation in the public defender system to be permanent.

We also note that in 1966 the Judicial Council, the predecessor of the State Board of Public Defense in supervising the public defender system, unanimously denied a request by the judges of the Eighth Judicial District to establish a public defender sys-

tem in the district on a conditional basis. The minutes of the September 30, 1966, meeting of the Judicial Council provide as follows:

C. Paul Jones, the State Public Defender, then presented his report to the Council. He indicated that he had met with the 8th Judicial District Judges who had made a proposal that the District would come under the Public Defenders Act on a conditional basis with the right to withdraw after four years. In the discussion that ensued the Council members unanimously took the position that under the Minnesota Defender's Act, there was no authority for a conditional acceptance. It was moved * * * [and seconded] that the Council was without authority to accept any Judicial Districts' resolution to come under the Defender Act which was in any way conditional. The motion was unanimously carried and Mr. Jones was instructed to report the position of the Council to the District Judges involved, it being the sense of the Council that once a District comes under the Act, it would require legislative action to exclude it in the future.

The Judicial Council, therefore, interpreted section 611.26, subd. 1, to provide that once the judges of a judicial district join the public defender system, that decision cannot be revoked by the judges. The Judicial Council made this interpretation of the statute on September 30, 1966, three months before the judges of the First Judicial District decided to participate in the public defender system. This interpretation, adopted soon after the enactment of the statute by the body charged with administering the statute, is entitled to deference.

■ The judges of the First Judicial District therefore do not have authority to withdraw from the public defender system.[1]

---

1. The judges of the First Judicial District also assert that they possess the inherent judicial power to withdraw from the public defender system. In *Clerk of Court's Compensation for Lyon County v. Lyon County Commissioners,* 308

Minn. 172, 180–82, 241 N.W.2d 781, 786 (1976), we set forth the principles that guide the exercise of inherent judicial power:

(1) Inherent judicial power grows out of express and implied constitutional provisions

■ 2. Minn.Stat. 611.26, subd. 2 (1984), provides that:

> Upon the filing of an order pursuant to subdivision 1 [establishing a public defender system in a judicial district] the state board of public defense shall appoint a district public defender after receiving recommendations from the judges of the district.

The judges of the First Judicial District argue that the recommendations of the judges of the district are the sole source of candidates for appointment to the position of district public defender. The judges of the First Judicial District therefore contend that the State Board of Public Defense failed to act in accordance with Minn.Stat. § 611.26, subd. 2 (1984), when it appointed Rick Mattox, who was not recommended by the judges, the district public defender for the First Judicial District.

This argument is refuted by the plain language of section 611.26. The statute instructs the State Board of Public Defense to appoint the district public defender "after" receiving recommendations from the judges of the district. It does not instruct the board to appoint "from" those recommendations. The board complies with section 611.26 when it receives the recommendations of the judges of the district, considers them, and appoints the candidate for the position of district public defender that it, as the appointing body, finds most qualified for the position, whether or not that person was recommended by the judges of the district. The interpretation of section 611.26 urged by the judges of the First Judicial District would essentially deprive the board of the appointment power the statute explicitly places in the board. We therefore conclude that Minn.Stat. § 611.26, subd. 2 (1984), does not require the board to appoint a candidate recommended by the judges of the district.

Finally, we note that interpretation of section 611.26, subds. 1 and 2, urged upon us by the judges of the First Judicial District, would conflict with the policy favoring professional independence of defense counsel embodied in Standard 5–1.3 of the American Bar Association's Standards for Criminal Justice:

> The legal representation plan for a jurisdiction should be designed to guarantee the integrity of the relationship between lawyer and client. The plan and the lawyers serving under it should be free from political influence and should be subject to judicial supervision only in the same manner and to the same extent as are lawyers in private practice. The selection of lawyers for specific cases should not normally be made by the judiciary or elected officials, but should be arranged for by the administrators of the defender

---

mandating a separation of powers and a viable judicial branch of government. It comprehends all authority necessary to preserve and improve the fundamental judicial function of deciding cases.

(2) Inherent judicial power is available to courts on all levels to be used consistent with respective jurisdictions and functions. * * *

\* \* \* \* \*

(5) The test to be applied in these cases is whether the relief requested by the court or aggrieved party is necessary to the performance of the judicial function as contemplated in our state constitution. The test is not relative needs or judicial wants, but practical necessity in performing the judicial function. The test must be applied with due consideration for equally important executive and legislative functions.

Our recognition of inherent judicial power is grounded in judicial self-preservation. Obviously, the legislature could seriously hamper the court's power to hear and decide cases or even effectively abolish the court itself through its exercise of financial and regulatory authority. If the court has no means of protecting itself from unreasonable and intrusive assertions of such authority, the separation of powers becomes a myth.

*Id.* at 177, 241 N.W.2d at 784.

We find that the present case involves "relative needs or judicial wants," rather than action necessary to the preservation of the judicial branch of government. The legislature has established two methods for the provision of counsel for indigent criminal defendants: appointment of counsel on a case-by-case basis or establishment of the public defender system in a judicial district. As we have concluded, once the judges of a judicial district establish a public defender system in their district, they have no authority to terminate that system. The fact that they wish to do so is not sufficient to justify the use of inherent judicial power.

and assigned-counsel programs. An effective means of securing professional independence for defenders is to place responsibility for the governance of the organization in a board of trustees. * *

I ABA Standards for Criminal Justice, § 5–1.3 at 5.13 (1982). As the commentary to Standard 5–1.3 explains,

> it is essential that * * * defenders * * * be fully independent, free to act in behalf of their clients as dictated by their best professional judgment. A system that does not guarantee the integrity of the professional relation is fundamentally deficient in that it fails to provide counsel who have the same freedom of action as the lawyer whom the person with sufficient means can afford to retain. Where counsel is not fully independent to act in the client's behalf, the deficiency is often perceived by the defendant, which encourages cynicism toward the justness of the legal system. * * *
>
> *   *   *   *   *   *
>
> [A] means of assuring the professional independence of defenders * * * is to provide for the establishment of boards of trustees to oversee the delivery of defense services. The presence of a board serves to insulate the legal representation plan from unwarranted judicial and political interference. * * *

I ABA Standards for Criminal Justice, Commentary to Standard 5–1.3, at 5.15–5.-16 (1982). In general, defense services should be provided to indigents in such a way that "remove[s] any implication that defense attorneys under the system are subject to the control of those * * * before whom they must appear in the representation of defendants. * * * " *Id.* at 5.17–5.-18.

The control sought by the judges of the First Judicial District over the appointment of the district public defender, evidenced by their insistence that the board appoint their recommended candidate and by their response to the failure of the board to so appoint, is contrary both to the statute and to the policy favoring the professional independence of defense counsel who serve indigent clients.

The petition by the judges of the First Judicial District for a writ of prohibition and for a writ of mandamus are denied.

Let the writ of prohibition sought by the State Board of Public Defense issue.